Ida NEWMAN

v.

CAMBRIDGE MUTUAL FIRE INSURANCE COMPANY and Stone Mill Insurance & Realty, Inc.

No. 81–193–Appeal.

Supreme Court of Rhode Island.

May 23, 1984.

114

Z. Hershel Smith, DiSandro-Smith & Associates, P.C., Inc., Providence, for plaintiff.

E. Howland Bowen, Providence, Brian G. Bardorf, Sheffield & Harvey, Newport, for defendant.

## OPINION

WEISBERGER, Justice.

This case comes before us on appeal from a judgment of the Superior Court rendered in favor of the defendants after a nonjury trial. The appeal is sustained in respect to the judgment in favor of the defendant Cambridge Mutual Fire Insurance Company (Cambridge) and denied in respect to the judgment in favor of Stone Mill Insurance & Realty, Inc. (Stone Mill). The facts of the case as set forth in the decision of the trial justice are as follows.

On November 8, 1967, Cambridge issued a policy of fire insurance in respect to Ida Newman's four-family dwelling at 79 Til-

den Avenue in Newport for a three-year period ending on November 8, 1970. The total premium was $75, which was paid by Ida Newman in three equal annual installments. The final payment was made November 3, 1969. This policy was issued through the Ray Flint Agency. Thereafter, Stone Mill purchased the Ray Flint Agency and entered into a limited-agency agreement with Cambridge. This limited-agency agreement was dated August 1, 1968. It is undisputed that Stone Mill did not have the authority to renew policies or to write new policies on behalf of Cambridge but only to service existing policies by the collection of premiums or the delivery of endorsements. Neither Cambridge nor Stone Mill sent notice to Ida Newman of the impending expiration of the policy, nor did either notify her that the policy would not be renewed. By its terms, this policy expired November 8, 1970. No further premium was paid. On April 30, 1971, the property was damaged by fire in an amount that exceeded the maximum policy coverage of $4,000.

Although Stone Mill did not send notice either to Ida Newman or to her son (Zalman D. Newman), who was also her attorney, a witness did testify on behalf of Stone Mill that notice was given to Mr. Gilbert Ramlose that this policy would not be renewed. Mr. Ramlose had represented himself to Stone Mill as the agent who originated the contested policy with the Ray Flint Agency. This witness also testified that Ramlose represented himself as plaintiff's agent. The plaintiff and her son deny that Ramlose ever notified them that this policy would not be renewed.[1] The trial justice held that neither Cambridge nor Stone Mill had any duty to notify the policyholder directly that this policy would not be renewed. However, he further decided that to the extent that Stone Mill had a duty to notify plaintiff, this duty was discharged by the notification to Ramlose who had apparent authority to act on behalf of plaintiff. On appeal plaintiff raises two major issues. In light of our determination of the first issue, we need not give extensive treatment to the second issue.

## I

### WHETHER CAMBRIDGE HAD A DUTY TO NOTIFY PLAINTIFF OF NONRENEWAL AND WHETHER THE BREACH OF THAT DUTY RENDERS CAMBRIDGE LIABLE UPON THE POLICY

The plaintiff argues that Cambridge did have a duty to notify plaintiff directly that her policy of insurance would not be renewed. The plaintiff predicates her argument upon a federal statute that was enacted on August 1, 1968, by Pub.L. 90–448. This statute became codified as 12 U.S.C.A. § 1749bbb–3 (1968), entitled FAIR Plan. Subsection (b)(9) of that statute reads as follows:

> "[n]otice will be given to any policyholder a reasonable time prior to the cancellation or nonrenewal of any risk eligible under the plan (except in case of nonpayment of premium or evidence of incendiarism), to allow ample time for an application for new coverage to be made and a new policy to be written under the plan, and the insurer shall, in writing, explain to the policyholder the procedures for obtaining an inspection under the plan in the notice of cancellation or nonrenewal[.]"

The terms of the federal statute were referred to by the Rhode Island Legislature in P.L.1969, ch. 211, which enacted chapter 33 of title 27 of the General Laws in order to take advantage of certain reinsurance opportunities made available by the federal statute for properties that might otherwise not be insurable because of risk or damage from riot, vandalism, or other form of violence. This statute set forth in § 27–33–1 its purposes: (1) to

---

**1.** Mr. Ramlose was unavailable to testify since he had died several years prior to the commencement of trial.

make basic property insurance available to qualified applicants who have been unable to secure such insurance in the normal market and (2) to create a fund to discharge the obligations of the state of Rhode Island to the secretary of the Department of Housing and Urban Development under Public Law 90–448. In order to implement this purpose, § 27–33–2 as enacted by P.L. 1968, ch. 211, § 1, set forth the following requirements:

"Participation.—Each domestic insurer and all insurers licensed to write those classes of insurance listed in title 27–8–1 and 27–8–3 in the state of Rhode Island, on a direct basis, shall participate in the basic property insurance and placement program established in this state in furtherance of the provisions of title XII, national insurance development program—commonly known as the FAIR PLAN. Failure to comply with this provision may be grounds for revocation, suspension or non-renewal of any said license."

Thus, it appears that the General Assembly of Rhode Island enacted a statute that was designed to dovetail with the provisions of the federal act in order to accomplish the objective of making insurance available to cover properties that might otherwise not be insurable.

In its original form, G.L.1956 chapter 33 of title 27, contained nine sections. Thereafter, the Legislature added §§ 10 and 11 to chapter 33, by means of P.L.1971, ch. 271, § 1. Section 11 grants to the Director of Business Regulation the power to "issue such rules, regulations, and orders as may be necessary to carry out the purposes of this chapter." This section also purported to ratify any regulation requiring coverage "described herein which has heretofore been promulgated by the insurance commissioner * * *."

On May 27, 1969, prior to the enactment of § 11, the Insurance Division of the Department of Business Regulation had filed

with the Secretary of State, regulation XV entitled "Basic Property Insurance Inspection and Placement Program." Section IX of that regulation reads in part as follows:

"(4) All Insurers participating in the Program shall give thirty days notice prior to cancellation or non-renewal of any risk eligible under the Plan but not written under the Plan except in the case of cancellation or non-renewal for the reasons specified in subsections (1) and (2) above. Such notice of cancellation or non-renewal shall explain the procedure for making application under the Plan." [2]

The Division of Insurance later amended regulation XV on October 16, 1970. Section IX as amended contained the following provisions:

"(1) All Insurers participating in the program shall give thirty days notice prior to cancellation or non-renewal of any risk eligible under the Plan except in cases of

   (a) owner or occupant incendiarism; or

   (b) material misrepresentation; or

   (c) non-payment of premium.

"Any cancellation notice to an insured written under the plan shall advise him of his right to appeal and the procedure therefore.

"Notice of cancellation or non-renewal of risks not written under the plan shall explain the procedure for making application under the plan."

The trial justice determined that these regulations were not applicable to the policy under consideration because the General Assembly had not authorized the Director of Business Regulations to promulgate regulations implementing chapter 33 of title 27 until the addition of § 11 through the passage of P.L.1971, ch. 271, § 1. He further held that the purported ratification of earlier regulations only applied in respect to the type of coverage to be provided, not in respect to notice of cancellation or, presumably, nonrenewal. In reaching this determination, the trial justice made an exhaus-

---

**2.** In general subsections (1) and (2) provided for cancellation for nonpayment of premium, incendiarism, or a finding of changed conditions that made the property uninsurable.

tive analysis of the various statutes that gave the Director of Business Regulations power to promulgate rules and regulations. For purposes of our decision, we shall assume, without deciding, that the trial justice was correct in his holding in respect to the inapplicability of regulation XV, § IX, to the instant controversy.

█ We are of the opinion that the provisions of 12 U.S.C.A. § 1749bbb–3(b)(9) were made applicable by virtue of P.L.1969, ch. 211, § 1 to all insurers licensed to write those classes of insurance "listed in title 27–8–1 and 27–8–3 in the State of Rhode Island." General Laws § 27–33–2. Sections 27–8–1 and 27–8–3 included fire insurance and comprehensive-coverage insurance issued by domestic and foreign companies. Consequently, the federal and state statutes read together imposed a duty upon all domestic and foreign insurers who participated in the FAIR Plan (all domestic and foreign insurers who wrote fire insurance in this state were required to do so) to give notice to a policyholder "a reasonable time prior to the cancellation or non-renewal of any risk eligible under the plan * *." 12 U.S.C.A. § 1749bbb–3(b)(9). It is undisputed that prior to the expiration of the policy of insurance under consideration here and prior to the loss, Cambridge was a participant in the FAIR Plan.

█ Since it is unquestioned that Cambridge gave no notice directly to the policyholder of nonrenewal of this policy, it was in breach of its statutory duty to give notice. Nevertheless, Cambridge argues that the Rhode Island Legislature, even in implementation of a federal statutory plan, was without power to modify or impair the obligations of an existing contract between the insurer and the insured by imposing a requirement of notice which was not set forth in the policy at the time of issue. Cambridge argues that such a notification would be in violation of art. 1, sec. 12, of the Constitution of Rhode Island. Cambridge does not cite the parallel provisions of art. I, sec. 10, of the Constitution of the United States, but since the language of these provisions is substantially identical, construction of the federal inhibition upon states to impair the obligation of contracts is of assistance in evaluating Cambridge's argument. A thorough review of the extent of the right of a state to modify existing contracts was set forth in *El Paso v. Simmons*, 379 U.S. 497, 85 S.Ct. 577, 13 L.Ed.2d 446 (1965). In that case Mr. Justice White, speaking for eight members of the Court, enunciated the following general principles:

"The decisions 'put it beyond question that the prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula,' as Chief Justice Hughes said in *Home Building & Loan Assn. v. Blaisdell*, 290 U.S. 398, 428 [54 S.Ct. 231, 236, 78 L.Ed. 413]. The *Blaisdell* opinion, which amounted to a comprehensive restatement of the principles underlying the application of the Contract Clause, makes it quite clear that '[n]ot only is the constitutional provision qualified by the measure of control which the State retains over remedial processes, but the State also continues to possess authority to safeguard the vital interests of its people. It does not matter that legislation appropriate to that end "has the result of modifying or abrogating contracts already in effect." *Stephenson v. Binford*, 287 U.S. 251, 276 [53 S.Ct. 181, 189, 77 L.Ed. 288]. Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order. * * * This principle of harmonizing the constitutional prohibition with the necessary residuum of state power has had progressive recognition in the decisions of this Court.' 290 U.S. at 434–435 [54 S.Ct. at 238–239]. Moreover, the 'economic interests of the state may justify the exercise of its continuing and dominant protective power notwithstanding interference with contracts.' *Id.*, at 437 [54 S.Ct. at 239].

**118**

The state has the 'sovereign right * * * to protect the * * * general welfare of the people * * *.' " 379 U.S. at 508, 85 S.Ct. at 583–84, 13 L.Ed.2d at 454–55.

 Applying the above-stated general principles to the facts of the case at bar, it would seem totally clear that a minor modification of an obligation to provide reasonable notice of nonrenewal of an insurance policy would constitute no impairment of a contract in the constitutional sense, based either upon state or federal constitutional provisions.

 Therefore, the general assembly had the power to incorporate by reference federal requirements concerning notice of cancellation and/or nonrenewal of insurance policies and to make such provisions applicable to existing contracts. When Cambridge determined that it would not renew plaintiff's policy of insurance, a duty arose in accordance with statutory requirements to notify the policyholder directly of said determination. No notice was given, and consequently, plaintiff did not take steps to provide herself with substitute insurance. This failure proximately resulted in the property's not being insured with another company at the time of the loss on April 30, 1971. As a result of the statutory policy enacted by the Congress in 1968 and implemented in respect to the State of Rhode Island in 1969, we believe that this lack of notice renders Cambridge liable under its policy as it would have been had said policy been renewed.

## II

WHETHER STONE MILL IS LIABLE TO PLAINTIFF FOR ITS FAILURE TO NOTIFY THAT CAMBRIDGE WOULD NOT RENEW ITS POLICY OF INSURANCE

In light of our determination of the first issue and our holding that Cambridge is liable under its policy[3] of insurance as

though the same had been renewed, no loss has been suffered by the plaintiff as a consequence of Stone Mill's failure of notice. Therefore, we shall assume, without deciding, that the decision of the trial justice in holding that there was no duty on the part of Stone Mill to notify the plaintiff was correct. We need not reach the issue of the apparent agency of Gilbert Ramlose.

For the reasons stated, the plaintiff's appeal is sustained in part and denied in part. The judgment of the Superior Court is reversed in respect to Cambridge and affirmed in respect to Stone Mill. The papers in the case may be remanded to the Superior Court with directions to enter judgment for the plaintiff against Cambridge for the face amount of its policy less the amount of the premium (plus interest thereon at the legal rate) that would have been due thereon had the policy been renewed, together with interest and costs.

---

**3.** It was agreed by the parties that plaintiff could recover, if at all, the sum of $4,000, which

sum represented the face amount of the policy.